UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Spice Corp,

                    Plaintiff

                                                      Civil No. 07-4767 (JNE/JJG)
v.
                                                      ORDER

Foresight Marketing Partners, Inc.;
Foresight Marketing Group, Inc.; and
Sandisk Corporation,

                    Defendants.

       Plaintiff Spice Corp ("Spice") brought this action against Defendants Foresight

Marketing Partners, Inc. ("FMP"), Foresight Marketing Group, Inc. ("FMG"), and SanDisk

Corporation ("SanDisk").  In its Complaint, Plaintiff asserts a number of claims against SanDisk,

including: Conspiracy (Count I); Breach of Sales Representative Agreement (Count III); Failure

to Pay Commissions on Demand (Count IV); Failure to Provide an Accounting (Count V);

Promissory Estoppel (Count VII); Conversion and Constructive Trust (Count VIII); Tortious

Interference with Business Expectancy (Count IX); Tortious Interference with Contract (X);

Unjust Enrichment (Count XI); Misrepresentation (Count XII); Fraud (Count XIII); Breach of

Implied Covenants of Good Faith and Fair Dealing (Count XIV); and Recovery in *Quantum

Meruit* for Plaintiff's Services to Defendant (Count XV).  Before the Court is SanDisk's Motion

for Summary Judgment on all Counts and Spice's Motion for Partial Summary Judgment on

Counts III and IV.  Spice has waived its claims for Conspiracy (Count I), Failure to Provide an

Accounting (Count V), Conversion and Constructive Trust (Count VII), Misrepresentation

(Count XII), Fraud (Count XIII), Breach of Implied Covenants of Good Faith and Fair Dealing

(Count XIV), and Recovery in *Quantum Meruit* for Plaintiff's Services to Defendant (Count

1

XV).[1]  Therefore, the Court grants SanDisk's Motion for Summary Judgment on those counts.

The remaining counts are discussed below.

## I.    BACKGROUND[2]

### A.  SanDisk-FMG Relationship

SanDisk is a multinational corporation that, among other things, sells flash memory and

USB drives.  SanDisk uses independent manufacturing representatives to sell some of its

products.  Defendant FMG was a SanDisk manufacturing representative from March 2004 until

July 19, 2006.  Pursuant to the contract between SanDisk and FMG ("SanDisk-FMG Contract")[3],

SanDisk assigned to FMG certain accounts to call on.  FMG earned a five percent commission

on all purchase orders shipped to its accounts.  FMG was solely responsible for hiring employees

and agents to call on these accounts.  SanDisk had no role in FMG's hiring process, payment

practices, or allocation of accounts.

The SanDisk-FMG Contract stated that FMG "is an independent contractor . . . and is

solely responsible for all of its employees and agents and its labor costs and expenses arising in

connection therewith and for any and all claims, liabilities or damages or debts of any type

whatsoever that may arise on account of [FMG]'s activities or those of its employees or agents in

the performance of this Agreement."  Ex. 40 ¶ 4.  Under the contract, FMG "ha[d] no authority,

---

[1]    Spice expressly waived its claims on Counts I, V, XII, and XII.  Spice further failed to oppose the motion for summary judgment on Counts VIII, XIV, and XV.  "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."  *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 756 (8th Cir. 2009).  During oral argument, Spice acknowledged these claims have been waived.

[2]    The facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Spice.

[3]    These types of contracts are also referred to a manufacturer's representative agreements or sales representative agreements.

right or ability to bind or commit SanDisk in any way." *Id.* Further, while SanDisk was "in no manner associated with . . . [FMG]'s employment of other persons or incurring of other expenses," SanDisk also had "no right to exercise any control whatsoever over [FMG's] activities." *Id.* Additionally, it was a non-exclusive representation agreement and did not limit "SanDisk's marketing or distribution activities or its appointment of other dealers, distributors, licensees, agents or representatives of any kind inside and outside the Assigned territory and or Accounts." *Id.* at ¶ 1D.

In addition to assigning accounts and defining the relationship between SanDisk and FMG, the SanDisk-FMG Contract also contained provisions relating to liability limitation, warranty disclaimers, proprietary information, intellectual property rights and responsibilities, and SanDisk's responsibility to provide products and marketing materials. The contract also provided that it could be terminated by either party upon 60 days written notice. *Id.* at ¶ 7C. However, any provision, including the termination provision, could be waived "with the written consent of the parties." *Id.* at ¶ 9D.

## B. Spice-FMG Relationship

In June 2006, FMG and Spice entered into a brokerage agreement ("Spice-FMG Contract"), under which Spice would represent SanDisk products to a subset of the accounts SanDisk assigned to FMG. Under the Spice-FMG Contract, Spice was to "represent[] manufacturers on an exclusive basis for sale of certain products" and "develop certain customers for the sale of such products." Ex. 2. FMG promised to pay Spice commissions of four percent on all net sales to Spice's accounts. SanDisk was not involved in recruiting or hiring Spice and played no role in negotiating the Spice-FMG Contract.

Spice, in turn, hired its own independent agents to sell SanDisk products to its assigned accounts.  It paid its agents a portion of the commissions Spice received from FMG.  Spice did not pay for its agents' expenses or time incurred while selling SanDisk products.

**C.  Spice-FMG Dispute and Termination of the Spice-FMG Contract**

Sometime around May 2006, a dispute arose between Spice and FMG.  According to Spice, commissions on several large Spice accounts were expected.  Rather than pay the commissions it owed to Spice, FMG attempted to renegotiate or alter the Spice-FMG Contract.  FMG attempted to make several changes to the contract, including a reduction in commissions from four percent to three percent, retroactive to March 2006.  On May 24, 2006, FMG sent Spice a letter that, according to Spice, attempted to take away some of the accounts that Spice had been calling on.  This letter also informed Spice that FMG would not be renewing the brokerage agreement at the end of its current term.  SanDisk was copied on this letter.

What ensued was a series of communications between Spice, FMG, and SanDisk regarding the dispute between FMG and Spice.  In particular, FMG owed Spice a substantial amount of commissions, which FMG had not yet paid.  On June 19, 2006, Marc Forsythe, the President of FMG, together with an individual named Doug Nobel, created a new company called Foresight Marketing Partners, Inc. ("FMP").  As both Forsythe and Nobel explained in their depositions, Forsythe wanted to become business partners with Nobel, but Nobel would only agree if they created a new corporation that gave them a "fresh start."  Nobel Dep. 26:2-9.  Nobel did not want to be involved in FMG, in part because of FMG's "contract and lack of contracts with Spice Corporation."  *Id.* at 29:15-21.  SanDisk had no role in Forsythe and Nobel's creation of FMP.  SanDisk did, however, believe that the new business was a "good partnership," because "Marc needed the stability of Doug and his ability to do the books, keep

track of things." Bergeson Dep. 104:2-5. Forsythe asked SanDisk to terminate the SanDisk-FMG Contract. SanDisk agreed to do so and gave FMG a written thirty-day notice of termination. The next day, SanDisk entered into a new manufacturer's representative agreement with FMP ("SanDisk-FMP Contract"). FMG then notified Spice that it had "lost" its contract with SanDisk and terminated the Spice-FMG Contract.

The emails and other communications between Spice, FMG, and SanDisk continued through August 2006. Spice was concerned about being paid the commissions owed by FMG and about Spice's continuing representation of SanDisk products. Throughout this time period, SanDisk repeatedly encouraged FMG to pay Spice the commissions FMG owed. FMG repeatedly promised that it would pay the amounts owed. Tom Lenaghan, President of Spice, testified that SanDisk promised Spice that *SanDisk* would pay the FMG-owed commissions if FMG did not. Lenaghan also testified that SanDisk promised that Spice could continue to service some of the Spice accounts in the future. It is these two promises that are the subject of this lawsuit. In their submissions to the Court, both Spice and SanDisk refer to excerpts from the email communications between the parties. However, rather than paraphrase the emails and take statements out of context, the Court finds that the most effective way to convey what was happening is to reproduce the emails in their entirety, or with only minimal omissions. Thus, the following language represents the written communications, in chronological order, as they appear in the record:[4]

- May 26, 2006 email from Dave Bergeson (SanDisk's National Sales Manager) to Tom Lenaghan (President of Spice) and Jeff Peterson (one of Spice's independent sales representatives) (ex. 9):

---

[4]     Typographical and grammatical errors appear in the emails themselves.

Tom

I have been made aware of the letter you received from FMG today.  Please do not contact myself or any other SanDisk employees until you and FMG have cleared you plan.

SanDisk has a contract with FMG, thus all of our communication will occur with FMG.

Ramsina and Janet please make your people aware that Jeff Peterson's accounts should be referred to Marc Forsythe until further notice.

Please abide by this request.

- May 30, 2006 email from Forsythe (FMG) to Bergeson (SanDisk) (Spice is copied on the email) (ex. 10):

  David,

  All customer inquiries need to be directed to either myself at FMG office . . . or Doug Nobel . . . .  This should cover all customer needs regarding SanDisk products.  We are contacting each customer as well as emailing official communication to all customers.  This process should be completed by the end of this week.

  I will also have new alternative contact info for David by the end of the week for each account.

- June 1, 2006 (2:25 p.m.) email from Bergeson (SanDisk) to Lenaghan (Spice) and Forsythe and Nobel (FMG) (ex. 11):

  Guys this is what I was talking about leave the SanDisk customer out of this.  Do not make any changes until you have come to an agreement.  I do not care what the agreement is but do not involve the customer.

  My suggestion was to leave as is until you come to an agreement.  This is a very "strong" suggestion I will not tolerate any confusion by our customer base that might affect or disrupt current SanDisk business.

  I suggest that Steve Peterson [(one of Spice's independent representatives)] go to the CVS meeting next week as you two negotiate.

  Business as usual in the eyes of our customers is critical.

- June 1, 2006 (4:19 p.m.) email from Bergeson (SanDisk) to Lenaghan (Spice) and Forsythe (FMG) (ex. 12):

Tom and Marc

I know you are both working on coming to some sort of an agreement.  I want to make sure that we do the following
1.  Do not send any correspondence to our customers regarding a change in assignment.  The last thing I want during this critical time of the year is to confuse the customer.
2.  It is early in you negotiations so I want to make sure we continue business as usual
3.  Let me know if through the course of your negotiations with each other if you want payment sent to a lock box or mutually agreed upon location and I will make the changes.

I do not want to confuse the customer I am concerned about messaging being sent to the customer too soon in this process.  Please abide by my request and I hope all turns out well.

Marc I spoke to Tom this morning and ask him that I no be involved in your negotiations.  I did and am asking both of you and your teams to not make any changes that might affect our customers unless mutually agree upon and sent to me in writing.

- June 1, 2006 (5:19 p.m.) email from Lenaghan (Spice) to Forsythe (FMG) and Bergeson (SanDisk) (ex. 10):

You must stop any contact with customers that Spice Corp has secures sales or purchase orders on Sandisk product.  Failure to do so will prove disruptive to Sandisk and Spice efforts over the past two years and is violation of our written contract from 2004.  You have sent us an accounting in May on over $21,000 currently owed to Spice that FMG has failed to pay Spice Corp on.  This also puts you in violation of the 2004 agreement.  I have place over 12 phone calls to you in the past 10 business days and you have failed to return any of those calls.  Your continued efforts to disrupt and Sandisk business with customers we have received purchase orders from will also put your company (FMG) in violation of our 2004 contract that clearly states that you nor FMG is to contact any Spice customers regarding Sandisk product.  I am only to happy to try for resolution but must immediately once against stop any contact with any customer that Spice Corp has generated sales and a PO for or Sandisk product.  The alternative will be expensive litigation for both FMG and Spice and potential damage to Sandisk business.  On current purchase orders received by Sandisk you will owe Spice Corp in excess of $150,000 in accordance with our 2004 agreement.  Once again stop you disruptive actions and cease all communication with any customer represented by Spice in which sales or purchase orders have been sent to FMG or Sandisk.  You are well aware of the customer list.

- June 4, 2006 (6:11 p.m.) email from Lenaghan (Spice) to Forsythe (FMG) (Bergeson (SanDisk) copied on email) (ex. 14):

Marc Forsythe,

I, Steve Peterson, Dick Crawford and Jeff Peterson are extremely concerned over your recent correspondence regarding SanDisk and the accounts we have been working on for over two years.  Spice received a recap from you thru 5/1/06 showing that FMG owed Spice $21,419.33.

You acknowledge to me that you received payment from SanDisk yet no money has been sent to Spice by FMG.  SanDisk has received purchase orders on Pos from customers assigned to Spice in writing or verbally by you and FMG.  The Pos are in excess of $2.5 million with Pos potentially to exceed a total greater than $5 million in the next few months.  Forecasts have been provided to FMG and SanDisk that exceed more than $10 million in sales for a twelve month period.  Spice is working with or had SanDisk product placed with over 40 customers.

Your recent comments on voice mail along with emails leaves all members of the Spice team at a loss. . . .  You also left me with a message on this same email that your non payment and attempt to change both verbal and written contracts is Spice?s fault.

Marc, your logic is flawed anyone who as you and FMG have done withholding payments of over $21,000 and try to change an agreement . . . [remainder of email not provided in the record].

- June 4, 2006 (11:54 p.m.) email from Forsythe (FMG) to Lenaghan (Spice) (Bergeson (SanDisk) copied on email) (ex. 14):

    Please direct all notices in writing to the address noted on our agreement.  I have sent you Dougs number and email several times.  You just don't read your email unless it relates to money.

    Doug will direct you to our attorney.  Since all of your messages are threatening and hostile I don't feel much like speaking with you.  Also since you continually threaten to sabotage SanDisk business I have trouble trusting you.

    I have no time to meet with you.

    As David has requested this will be resolved very soon I'm sure.

- June 5, 2006 (8:21 a.m.) email from Lenaghan (Spice) to  Forsythe (FMG) ((Bergeson (SanDisk) copied on email) (ex. 14):

    Since I am responding to your email of 6/4/2006 you are wrong about me not responding to emails or that I don't read them.  In your voice mail you asked me to call your attorney on Friday and you won't provide a number.  Neither I nor anyone

at Spice has ever left you a threatening message or treated you in a hostile fashion. Clearly you are trying to justify non payment of money owed to Spice due to your wrongful actions. In addition Spice has never threatend sabbotage against SanDisk business. Everyone at Spice has been advised that it is business as usual until the issue of your non payment of money due Spice can be worked out.

My attempt to meet with you in Orlando this week was to follow direction given to both of us by David Bergeson for both Spice & FMG to try & resolve any issues. Your response to me seems to suggest you intend to continue your wrongful actions & avoid conclusion of the problem you have created. Once again I am available to meet in Orlando to try & move forward thru the 6th of June 2006.

- June 5, 2006 (8:28 a.m.) email from Bergeson (SanDisk) to Lenaghan (Spice) and Forsythe (FMG) (ex. 14):

  Cut me out of this email chain

- June 5, 2006 (11:49 a.m.) email from Lenaghan (Spice) to Bergeson (SanDisk) (ex. 14):

  I will have Jeff forward the account list for Spice on all customers we have shipped or we are calling on. I would ask that you have all funds frozen going to FMG and sent to an account number I will supply you with ASAP. . . . Spice intends to set aside any money due FMG and pay FMG once all money has been recouped from past due amounts to Spice. Your help in obtaining an accounting of previous payments made to FMG would be great. I hope we can move forward with Spice and grow the SanDisk sales. Thanks for your help.

- June 5, 2006 (12:05 p.m.) email from Bergeson (SanDisk) to Lenaghan (Spice) (ex. 14):

  I need to get this from Marc or your attorney I cannot freeze funds unless I get this officially. My contract is with FMG I would risk legal action. I cannot forward the commission report you will have to get that from FMG or again have you attorney request them.

- June 5, 2006 (12:19 p.m.) email from Jeff Peterson (Spice) to Bergeson (SanDisk) (ex. 13):

  Tom asked me to send you this current list of accounts that Spice, Corp. has either sold or is in the process of call on, so you know who we are dealing with. This is the list we would like protected. Thank you David.

- June 13, 2006 email from Forsythe (FMG) to Lenaghan (Spice) (ex. 15):

  We will be paying you the monies owed as outlined in the recap sent to you last month. I will notify you when that check has been sent. I will recap to you the negative balance for this months commissions which was due to customer returns. This will be deducted from what was due to you last month.

- June 21, 2006 letter from Spice's attorney (Charles Cheney) to Bergeson (SanDisk) (ex. 17):

> I am writing to you as Attorney for Spice Corp. concerning the Brokerage Agreement between [FMG] and [Spice]. . . .
>
> Spice believes that Foresight is in breach of this agreement since it has not paid them $21,419.33 which was due on May 1, 2006.  Within 45 to 60 days $120,000-$150,000 will be due to Spice. . . .  The result of Foresight's failure to pay Spice could have a very detrimental effect on both Spice and SanDisk.  If Spice is not paid, it will not be able to pay its sub distributors.  The sub distributors will then likely stop soliciting business from Spice's accounts and Spice's ability to sell SanDisk product will also be impaired. . . .
>
> Spice has honored its agreement with Foresight and has secured a great deal of business for SanDisk.  If Foresight is allowed to continue to breach their agreement with Spice, there will be serious ramifications for all involved.  Spice asks that you assist them in convincing Foresight that it must honor the original Brokerage Agreement.
>
> Spice also requests that SanDisk freeze all payments to Foresight until this matter is settled.  Please send Spice a report showing all past sales for customers sold SanDisk products by Spice.  Spice needs this information to determine the unpaid commissions due from Foresight.  We ask that you redirect all future commission payments due Foresight to Spice until all past due receivables are recouped by Spice.  Once Spice has totally recouped all past due receivables it will deliver the remainder of the payments received by Spice to Foresight.
>
> Spice would like to enter into a standard rep agreement directly with SanDisk covering all customers listed on the attached Schedule B as well as all other customers we are currently representing.  Spice has spent two years representing SanDisk products to retailers and other distributors.  They value the brand and believe that they can continue to grow the business for Spice as well as SanDisk.
>
> Spice is truly sorry for the problems being caused by Foresight.  Mr. Lenaghan has instructed all of his people to continue to represent SanDisk in a professional manner and has stressed that they should cause no disruption to SanDisk or its customers.

- July 10, 2006 letter from FMG's attorney (Jon Coats) to Lenaghan (Spice) (ex. 47):

> Enclosed for your review please find a copy of the June 19, 2006 correspondence from SanDisk Corporation terminating its contractual relationship with my client, [FMG]  Pursuant to ¶1, page 1 of your June 23, 2004 Brokerage Agreement with [FMG], please accept this correspondence as written notice from my client that it has

lost its rights to the SanDisk product line, and therefore, Spice Corp, shall immediately cease representing said product line.

- July 18, 2006 (11:19 a.m.) email from  Bergeson (SanDisk) to Jeff Peterson (Spice) (ex. 18):

     You will get paid through August 31st as instructed today after that period we will look at who has what.  I was advised by attorneys to remain on the sidelines until that period I have no say in who he has call on the account for the next months.

     Hold tight

- July 18, 2006 (12:27 p.m.) email from  Bergeson (SanDisk) to Jeff Peterson (Spice) (ex. 19):

     I appreciate your efforts we will work things out.

- July 19, 2006 letter from FMG's attorney (Jon Coats) to Lenaghan and Jeff Peterson (Spice) (ex. 20):

     Mr. Jeffrey Peterson and Mr. Tom Lenaghan -

     Please be advised that your (Mr. Peterson's) email communications to Mr. David Bergeson of SanDisk on Tuesday, July 18, 2006 @ 12:22 P.M. and to Larry Pepin with cc to Mr. Bergeson of Wednesday, July 19, 2006 @ 11:00 A.M., are in contravention to Spice Corp.'s obligation to cease representation of the SanDisk product line, pursuant to the terms and conditions contained in the Brokerage Agreement drafted by Spice Corp., which specifically and unambiguously require that such communications cease after Spice's receipt of notice from my client, [FMG], that it has lost its right to the SanDisk product line. . . .

     PLEASE BE ADVISED THAT MY CLIENT HAS BEEN INFORMED BY SANDISK OF YOUR ABOVE-REFERENCED COMMUNICATIONS AND SANDISK HAS ASKED MY CLIENT TO ONCE AGAIN NOTIFY SPICE CORP THAT SPICE CORP **DOES NOT REPRESENT SANDISK PRODUCTS AND THAT SUCH COMMUNICATIONS SHOULD CEASE IMMEDIATELY**.

     AGAIN, PLEASE GOVERN YOURSELF ACCORDINGLY.

- July 24, 2006 letter from Spice's attorney (Cheney) to FMG's attorney (Coats) (ex. 21):

     Spice Corp. is in receipt of your letter dated July 10, 2006 informing Spice that it must immediately cease representing the San Disk Corporation product line due to San Disk Corporation terminating its contractual relationship with [FMG].

Our investigation indicates that Marc Forsythe registered a corporation named Foresight Marketing Partners, Inc. on June 19, 2006, the date of the letter from San Disk Corporation giving [FMG] notice that it was terminating their contractual relationship.  [FMP] and [FMG] are both located at the same address and Marc Forsythe is President of both companies.  Our investigation further indicates that Marc Forsythe has contacted a number of accounts that Spice represented prior to its contractual relationship with [FMG] being terminated.  This is problematic for two reasons.  First, Spice believes that Marc Forsythe was calling on Spice accounts prior to receiving notice that its contract was being terminated.  Also, we believe that that Spice's contract is still in force until Foresight's contract is actually terminated, not when it received notice that he contract would be terminated in the future.

Should our investigation determine that Marc Forsythe continues to represent San Disk via [FMP] and we determine that there has been a fraudulent conveyance, Spice Corp. will exercise all legal remedies available to it to ensure that it is properly paid pursuant to its Brokerage Agreement with [FMG].

Spice is also concerned that [FMG] is late with payments due them for sales of SanDisk product.  Spice demands a reconciliation of the commissions due it and immediate payment.  [FMG] must also pay Spice on a timely basis for all sales made prior to its contract being cancelled.

- July 25, 2006 email from Bergeson (SanDisk) to Forsythe (FMG) (ex. 49):

  Unpaid they can more harm than good.  Pay them you agreed to do so last week and the week before.

  If you cannot show me that you paid them I will suspend payments to FMG and divide the money out myself.

  This is taking way to much of my time.  Please do what is right and pay these guys what is due to them.

- July 25, 2006 email from Bergeson (SanDisk) to Lenaghan and Jeff Peterson (Spice), with an accounting of all sales of SanDisk products to Spice accounts (ex. 22):

  Hope this helps yours are in yellow.  Both YTD and QTD

- July 28, 2006 letter from FMG's attorney (Coats) to Spice's attorney (Cheney) (ex. 50):

  I am in receipt of and thank you for your correspondence of July 24, 2006 regarding the [Brokerage Agreement between FMG and Spice].

  The results of your investigation revealing the formation of a new corporate entity named [FMP] are accurate.  Additionally, [FMG] was verbally advised prior to its receipt of the June 19, 2006 termination notice from SanDisk that SanDisk would in

all likelihood be terminating its contract with [FMG].  The June 19, 2006 correspondence was simply written confirmation of SanDisk's warning that it would cancel its relationship with [FMG].

Obviously, a business decision was made to immediately form a new corporate entity that was not entangled with disruptive third-party relationships that, in the opinion of [FMG], led to the termination of its relationship with SanDisk.  Fortunately, the newly formed corporate entity of [FMP] has been able to establish a relationship with SanDisk, thereby confirming the opinions previously held as to the cause of the contract termination with [FMG].

Please take comfort in the fact that my client fully intends to comply with its obligations arising under the [Spice-FMG Contract], which was terminated on July 19, 2006, ie, 30 days after June 19, 2006.  Your client's allegations of a "fraudulent conveyance" are nonsensical.  There has been no conveyance or transfer of property, and [FMG] is still an active an ongoing corporate entity, it simply lost its contract with SanDisk. . . .

Your client will receive all commission amounts earned up to the contract termination date of July 19, 2006. . . .

Therefore, enclosed please find a check in the amount of $5,025.72 for May commissions, along with the latest commission statement. . . .  For purposes of moving forward, my client will provide Spice Corp an updated monthly commission statement at the end of each month showing all commissions due and negative sales/commission amounts along with additional payments until Spice has received all commissions due it through the contract termination date of July 19, 2006. . . .

- July 31, 2006 email from Bergeson (SanDisk) to Jeff Peterson (Spice) (ex. 23):

  I have grown tired of this conversation.  You are temporarily not representing SanDisk.  You worked for FMG and they are not longer that entity.

  You are getting paid as I have said for at least the 10th time to both you an Tom.

  You both are driving me crazy

- Aug. 8, 2006 email from Bergeson (SanDisk) to Jeff Peterson (Spice) and Jim Gall (SanDisk) (Lenaghan (Spice) is copied on the email) (ex. 25):

  You are feeding the fire forward all contacts to Jim he will distribute to the correct rep.

  Leave a message on your machine and on email forwarding to Jims number and email address for all SanDisk questions and inquiries.

13

This has to stop now.

- Aug. 30, 2006 email from Bergeson (SanDisk) to Lenaghan and Jeff Peterson (Spice) (ex. 26):

    You have got to be kidding don't mind.  Your boss called our CEO, GM, and executive VP.

    BTW none are going to call him back.  He burned any chance you two had of ever doing any future business with SanDisk.

    All of the above support my efforts and agree with my current path so his calls were more damaging to his firm than helpful.

- Nov. 13, 2006 letter from Lenaghan (Spice) to SanDisk's CEO (Nelson Chan), describing Spice's concerns about FMG, FMP, and Bergeson's "questionable and unethical activities." (ex. 27)

- May 22, 2007 letter from SanDisk's attorney (Damon Anastasia) to Lenaghan (Spice) (ex. 54):

    Though some time has passed since we spoke by telephone in response to your letter of November 13, 2006 to Mr. Nelson Chan of SanDisk Corporation  ("SanDisk"), you will recall that I stated SanDisk would conduct an investigation into your allegations and I would notify you of that event.  Having now completed its investigation, SanDisk has concluded that no further action is necessary.  It has closed its file in this matter.

## D.  Spice Sues FMG, FMP, and SanDisk

In October 2007, Spice initiated this lawsuit against SanDisk, FMG, and FMP.  The case was removed to federal court based on diversity jurisdiction on December 5, 2007.  Based on the arbitration provision in the Spice-FMG Contract, on May 13, 2008, this Court issued an order compelling arbitration of Spice's claims against FMG and FMP.  On May 14, 2008, the Court granted SanDisk's Motion to Stay pending the arbitration.  FMG and FMP subsequently refused to attend or participate in the arbitration.  Spice alone attended the arbitration on September 14, 2009.  The arbitrator found that FMG and FMP owed past-due commissions of $942,422.04, attorney's fees of $543,560.15, costs of $20,627.70, and punitive damages of $462.211.02.  The

arbitrator found FMP to be a successor corporation of FMG and made its award jointly and severally against FMG and FMP. Both FMG and FMP, however, have been dissolved and, according to Spice, have no assets.[5] The Stay against SanDisk was subsequently lifted and the parties conducted discovery. They now bring their Cross-Motions for Summary Judgment.

## II.    DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.  Breach of Sales Representative Agreement (Count III)

Spice alleges that on June 1, 2006, it formed an oral or implied contract, or sales representative agreement, with SanDisk, in which SanDisk promised that Spice could service SanDisk accounts after August 31, 2006. Under Minnesota law, an "agreement necessary to form a contract . . . may be implied from circumstances that clearly and unequivocally indicate the intention of the parties to enter into a contract." *Webb Bus. Promotions, Inc. v. Am.*

---

[5]     Spice cites to page 247 of Doug Nobel's deposition transcript—this page, however, was not provided to the Court. Thus, the Court can find nothing in the record to support Spice's assertion that neither FMG nor FMP have any assets. For purposes of this motion, however, this issue is irrelevant.

*Electronics & Entm't Corp.*, 617 N.W.2d 67, 75 (Minn. 2000).  "A contract implied in fact is in all respects a true contract.  It requires a meeting of the minds the same as an express contract." *Roberge v. Cambridge Co-op. Creamery*, 79 N.W.2d 142, 145-46 (Minn. 1956); *see also Mattice v. Minn. Prop. Ins. Placement*, 655 N.W.2d 336, 344 (Minn. Ct. App. 2002) ("[T]o be valid, the parties must have a meeting of the minds regarding essential contract elements.").  "A contract does not exist unless the parties have agreed 'with reasonable certainty about the same thing and on the same terms.'"  *Lupient v. Londo*, 2004 WL 117600, at *4 (Minn. Ct. App. Jan. 27, 2004) (quoting *Peters v. Mut. Ben. Life Ins. Co.*, 420 N.W.2d 908, 914 (Minn. Ct. App. 1988)); *see also Jenson v. Taco John's Int'l, Inc.*, 110 F.3d 525 (8th Cir. 1997) ("[A]n enforceable contract requires reasonable certainty about the intent of the parties regarding the fundamental terms of the contract."  (citing *Hill v. Okay Constr. Co., Inc.*, 252 N.W.2d 107, 114 (Minn. 1977))).  "The test of contractual formation is an objective one, to be judged by the words and actions of the parties and not by their subjective mental intent."  *Hill*, 252 N.W.2d at 114; *see also Bergstedt, Wahlberg, Berquist Assocs. v. Rothchild*, 225 N.W.2d 261, 263 (Minn. 1975) ("It is the objective thing, the manifestation of mutual assent, which is essential to the making of a contract.").

In support of its argument, Spice points to Lenaghan's testimony that Bergeson promised Spice could continue to service some accounts in the future.  Spice also points to the June 1, 2006 emails in which Bergeson suggested that Spice and FMG make no changes, or "leave as is," until they reached an agreement.  Bergeson also suggested that one of Spice's independent sales agents go to a meeting at CVS, one of Spice's accounts, and maintain "[b]usiness as usual in the eyes of our customers."  Ex. 11.  Bergeson did not want Spice or FMG to "make any changes that might affect [SanDisk] customers unless mutually agree[d] upon and sent to [Bergeson] in writing."  Ex. 12.  On July 18, 2006, Bergeson told Jeff Peterson at Spice, "I

appreciate your efforts we will work things out." Ex. 19.  Also on July 18, Bergeson told Spice

that after August 31st, "we will look at who has what. . . .  Hold tight." Ex. 18.

Considering all evidence in the light most favorable to Spice, there is simply not enough,

or any, specificity to form a contractual relationship.  At most, there is just a vague promise that

Spice would get some unnamed accounts sometime in the future.  "It is a fundamental rule of law

that an alleged contract which is so vague, indefinite, and uncertain as to place the meaning and

intent of the parties in the realm of speculation is void and unenforceable.  Consequently, where

substantial and necessary terms are specifically left open for future negotiation, the purported

contract is fatally defective." *King v. Dalton Motors, Inc.*, 109 N.W.2d 51, 52 (Minn. 1961).

Here, all of the fundamental terms of a manufacturer's representative agreement are missing.

First, it is uncertain which accounts SanDisk allegedly promised to Spice.  Spice relies on

evidence that SanDisk was aware of which accounts Spice had been calling on under its contract

with FMG.  For example, on June 5, 2006, Jeff Peterson at Spice sent Bergeson a list of Spice's

accounts.  Ex. 13.  On July 25, 2006, Bergeson sent Spice a list of the year-to-date and quarter-

to-date sales to Spice's accounts.  Ex. 22.  However, SanDisk's awareness of Spice's accounts

under the Spice-FMG Contract is not tantamount to a promise of those same accounts in the

future.  In fact, Lenaghan testified that Spice did not expect SanDisk to protect all of the

accounts assigned to Spice under the Spice-FMG Contract.  Lenaghan testified that SanDisk

promised to give Spice the accounts for which there were new customer forms—accounts that

Spice had opened.  But Spice points to nothing in the record indicating that the parties knew or

agreed upon which accounts those were.  When asked during his deposition if Bergeson ever told

him which specific accounts would be Spice's, Lenaghan responded, "He said that he knew what

accounts they were.  Did he give me the specifics?  No." Lenaghan Dep. 178:15-179:2.  Thus, it

is not apparent that Spice even knew which accounts were purportedly being promised to it. There is no evidence that SanDisk ever promised any specific accounts, that Spice ever asked for any specific accounts, or that Spice ever provided SanDisk with a list of the specific accounts to which it thought it was entitled.  Further, the record does not include any list of specific accounts that Spice claims SanDisk promised to it.  Thus, even if SanDisk had promised Spice some accounts in the future, Spice points to nothing in the record from which a jury could determine which accounts those were.

The emails Spice relies on only further highlight this vagueness.  No reasonable jury could view Bergeson's statement that after August 31st, "we will look at who has what," as a definite promise.  It indicates that the status of the Spice accounts in the future is uncertain, to be determined at a later date.  Bergeson's statement that "we will work things out" does not provide any clarity as to *how* they might work it out.  There is no evidence that "we will work things out" means that SanDisk will award defined accounts to Spice in the future.  Bergeson's suggestion to "leave as is" also does not support Spice's position, since the status quo was Spice operating under a contractual agreement with *FMG*—not with SanDisk.

All of the other fundamental terms of a manufacturer's representative agreement are also conspicuously absent.  For example, there is no evidence regarding Spice's commission rate under the alleged contract, when commissions would be earned and paid, Spice and SanDisk's contractual obligations, Spice's reporting requirements, how Spice would obtain products and marketing materials from SanDisk, the duration of the alleged contract, or how the agreement might be terminated and by whom.  The Court need only look at the SanDisk-FMG Contract to see what types of provisions may appear in one of these agreements.  While it is not necessary

that Spice's alleged contract with SanDisk contain all of these provisions, it should at least contain *some* of them.

Further, Spice had no reason to expect that it would have gotten a more generous contract with SanDisk than FMG had with SanDisk. The SanDisk-FMG Contract was non-exclusive, for a renewable term of one year, and clearly set forth the circumstances under which SanDisk could terminate the agreement. The SanDisk-FMG Contract also sheds light on what sorts of provisions SanDisk found important in a manufacturer's representative agreement. For example, there are numerous provisions related to SanDisk's intellectual property rights, including: SanDisk's ability to acquire all rights in any modifications, design changes or improvements of SanDisk products suggested by customers or employees; confidentiality of proprietary information; and representatives' use of SanDisk's service marks, trademarks, trade names, and product images. The SanDisk-FMG Contract also emphasizes that the manufacturer's representative "is solely responsible for all of its employees and agents" and that it has "no authority, right or ability to bind or commit SanDisk in any way." It is not reasonable to expect SanDisk to enter into an oral manufacturer's representative agreement with Spice that contained *none* of these terms.

Even if SanDisk's vague promise of future accounts was sufficiently definite, the Court looks not only at the words used by the parties, but also at the parties' conduct. On June 21, 2006, Spice's attorney sent a letter to SanDisk, stating that "Spice would like to enter into a standard rep agreement directly with SanDisk covering all customers listed on the attached Schedule B as well as all other customers we are currently representing." Had such an agreement already existed as of June 1, 2006, as Spice claims, then this letter would have made

no sense.  When objectively viewing Spice's conduct, it does not indicate that an oral or implied manufacturer's representative agreement existed as of June 1, 2006.

Moreover, even if there had been such a contract at some time, SanDisk terminated it on several occasions.  On July 31, 2006, SanDisk told Spice that Spice was "temporarily not representing SanDisk."  On August 8, SanDisk told Spice to forward "all SanDisk questions and inquiries" to Jim Gall, a SanDisk employee.  On August 30, SanDisk wrote that Lenaghan "burned any chance [Spice] had of ever doing any future business with SanDisk."  There is no evidence that after July 31st, SanDisk made any promises to Spice regarding future accounts.

Viewing the evidence in the light most favorable to Spice, a reasonable jury could not conclude that there was ever a "meeting of the minds" regarding the "essential contract elements" of a Sales Representative Agreement.  The record does not show that such an agreement ever existed between Spice and SanDisk.  Further, Spice points to no evidence to show that the alleged agreement was not terminated by SanDisk.  Thus, Spice's claim for the breach of that agreement must fail.  SanDisk is entitled to summary judgment on this claim.  Spice's motion for summary judgment on Count III is denied.

**B.  Failure to Pay Commissions on Demand (Count IV)**

The Court notes that because there never was a contract between SanDisk and Spice under which SanDisk was to pay commissions directly to Spice (i.e., no Manufacturer's Representative Agreement), SanDisk could not have breached such a contract by failing to pay commissions on demand.  Rather, Spice argues that SanDisk contractually promised to pay the commissions owed by FMG, and thus breached that contract when it did not pay those FMG-

owed commissions.[6]  As previously noted, to have a valid, enforceable contract, "the parties

must have a meeting of the minds regarding essential contract elements."  *Mattice v. Minn. Prop.*

*Ins. Placement*, 655 N.W.2d at 344.  Whether such a contract exists is based on the objective

manifestations of the parties.  *See, e.g.*, *Bergstedt, Wahlberg, Berquist Assocs. v. Rothchild*, 225

N.W.2d at 263. Further, "an alleged contract which is so vague, indefinite, and uncertain as to

place the meaning and intent of the parties in the realm of speculation is void and

unenforceable."  *King*, 109 N.W.2d at 52.

       In support of its argument, Spice points to SanDisk's repeated assurances that "you will

get paid."  On July 31, 2006, Bergeson wrote to Jeff Peterson, "You are getting paid as I have

said for at least the 10th time to both you an[d] Tom."  Ex. 23.  However, none of the above

written communications indicate that *SanDisk* will be paying Spice.  For this missing detail,

Spice relies on Lenaghan's deposition, in which he testified that Bergeson told him *SanDisk*

would pay if FMG did not.  SanDisk argues that based on the words and actions of Spice,

SanDisk, and FMG, there was no "meeting of the minds" regarding SanDisk's purported

obligation to pay the commissions FMG owed to Spice.  When viewing the parties' conduct

objectively, the Court agrees.  The statement "you will get paid" does not indicate a clear

promise that *SanDisk* will pay Spice.  Especially when reading the emails and letters in context,

it is apparent that SanDisk was merely relaying the assurances it kept getting from FMG that

*FMG* would pay the commissions it owed to Spice.

       Spice relies on the email SanDisk sent to FMG, in which SanDisk threatened to "suspend

payments to FMG and divide the money out" itself if FMG did not pay.  However, this statement

---

[6]       At some points, Spice seems to assert that this contract was formed on June 1, 2006.
However, at other times, it appears to argue that an entire course of conduct spanning from June
through July 2006 resulted in the formation of this contract.  Thus, it is not clear to the Court as
of what date Spice alleges a contract was supposedly formed between Spice and SanDisk.

was contained in an email sent to FMG, not to Spice, so it in no way was a representation from SanDisk to Spice.  Further, no reasonable jury could conclude that this statement was a *promise* to set aside money for Spice.  Read in context, it is merely part of SanDisk's attempt to persuade FMG to pay.  The sentence immediately preceding the quoted phrase is: "Pay them you agreed to do so last week and the week before."  Ex. 49.  The sentences immediately following the quoted phrase are: "This is taking way to[o] much of my time.  Please do what is right and pay these guys what is due to them."  *Id.*  Similarly, Spice also relies on SanDisk's suggestion of setting up a lockbox, accessible to Spice and FMG.  In the email from SanDisk to FMG and Spice, Bergeson stated, "[l]et me know if through the course of your negotiations with each other if you want payment sent to a lock box or mutually agreed upon location."  There is nothing in the record indicating that Bergeson *promised* to set up such a lockbox.  Bergeson was merely offering a suggestion to assist FMG and Spice as they attempted to resolve their dispute.  In fact, under the SanDisk-FMG Contract, Bergeson was not permitted to withhold payment to FMG— had he done so, he would have been in breach of the SanDisk-FMG Contract.

Additionally, even if Bergeson told Lenaghan that SanDisk would pay the commissions owed by FMG, when determining whether a contract exists the Court looks at both the words *and* actions of the parties.  Neither Spice nor SanDisk acted in such a way as to indicate that SanDisk was responsible for the payments owed by FMG.  The record is replete with instances in which SanDisk urged FMG to pay Spice the amounts owed.  More importantly, Spice itself continually demanded that FMG, not SanDisk, pay the owed commissions.  Lenaghan repeatedly wrote to FMG, demanding payment.  Spice's attorney wrote to FMG, demanding payment.  Between May and August 2006, the record reveals five written communications in which Spice refers to FMG's failure to pay the commissions owed.  During this same time period, there are

22

no written communications in which Spice refers to SanDisk's failure to pay the same

commissions.  Notably, up until the November 2006 letter to SanDisk's CEO, the record is

devoid of any emails or letters in which Spice demands payment from SanDisk.  Spice, did,

however, write to SanDisk on June 21, 2006, asking SanDisk to "assist [Spice] in convincing

Foresight that it must honor the original Brokerage Agreement" and pay Spice.  Ex. 17.  Thus,

even after the alleged contract between SanDisk and Spice was entered into, Spice consistently

only asked FMG for payment.  When viewed objectively, Spice's actions do not indicate that

Spice believed SanDisk was contractually obligated to pay FMG's debt.  Such circumstances do

not "clearly and unequivocally indicate the intention of the parties to enter into a contract."

*Webb Bus. Promotions, Inc.*, 617 N.W.2d at 75.

Further, even if Bergeson promised that SanDisk would pay if FMG did not, and the

parties had acted in a way that objectively manifested mutual assent, again the terms of the

alleged contract are too indefinite to be enforceable.  There is nothing in the record indicating

that the parties agreed on exactly how much money SanDisk would pay.  On June 1, 2006, Spice

copied SanDisk on an email which stated that FMG owed over $21,000, and forecasted that

FMG would owe Spice "in excess of $150,000" in the near future.  On June 4, Spice copied

SanDisk on an email which stated that FMG owed Spice $21,419.33 and that purchase orders of

several million dollars were expected in the next few months, with forecasts of over ten million

dollars in sales over the next year.  On June 21, 2006, Spice's attorney sent a letter to SanDisk,

informing SanDisk that FMG owed $21,419.33, and that within the next forty-five to sixty days,

FMG would owe Spice somewhere between $120,000 and $150,000.  Thus, the amount

purportedly promised is somewhere between $140,000 and over $170,000—this is not a definite

amount.  Spice's communications are projections of amounts to be owed in the future, which

necessarily leave the term of payment open.  "[W]here substantial and necessary terms are specifically left open for future negotiation, the purported contract is fatally defective."  *King*, 109 N.W.2d at 52.  Further, the record provides no evidence that SanDisk ever promised this, or any other, amount.  SanDisk's alleged promise that Spice "will be paid," does not indicate how *much* Spice will be paid, *when* Spice will be paid, or *for what* Spice will be paid.  Spice claims that the promise is for the commissions owed by FMG, but there is no evidence as to exactly for which sales those commissions were due or for what time period SanDisk was obligating itself. There is no evidence as to whether SanDisk was promising to pay only the commissions FMG owed up until the date of the promise (the date of which is unclear), or whether SanDisk was promising to pay the commissions Spice earned up through the Spice-FMG Contract termination date of July 19, 2006.  "Contracts must be certain in terms, and not so indefinite and illusory as to make it impossible to say just what is promised."  *Druar v. Ellerbe & Co.*, 24 N.W.2d 820, 826 (Minn. 1946) (internal quotation marks omitted).  Without evidence of the amount promised, the date payment would be due, or any other essential terms, the promise is too indefinite to be enforceable.

Moreover, it is undisputed that any promise by SanDisk to pay Spice the FMG-owed commissions would have been an assurance or guarantee.  As such, it falls within Minnesota's Statute of Frauds.  Under Minnesota Statute § 513.01, a writing or memorandum "expressing the consideration" is required for "every special promise to answer for the debt, default or doings of another."  Minn. Stat. § 513.01(2) (2011); *see also Bruce v. Walters*, 231 N.W. 16, 17, 18 (Minn. 1930) (finding that an oral agreement between the parties to "pay a debt of another" is "within the statute of frauds" and therefore "not enforceable").  A memorandum is sufficient only if it "set[s] forth all the essential terms of the agreement so that it may be proved on the basis of such

memorandum without resort to parol evidence." *In re Petroleum Carriers Co.*, 121 F. Supp.

520, 523 (D. Minn. 1954).  Spice has pointed to no signed memoranda that satisfy the statute of

frauds.  Nor did Spice address this argument in its brief.  "The purpose of this provision of the

Statute of Frauds is to enable the courts to ensure that one who receives no benefit from a

promise is bound only by the exact terms of his promise." *Esselman v. Production Credit Ass'n*

*of St. Cloud*, 380 N.W.2d 183, 186 (Minn. Ct. App. 1986).  "There is [] a temptation for a

promisee, in a case where the real debtor has proved insolvent or unable to pay, to enlarge the

scope of the promise or to torture mere words of encouragement into an absolute promise." *Id.*

at 187.  Such appears to be the case here.  With no writing, Spice fails to satisfy the statute of

frauds.  Thus, SanDisk's alleged guarantee to pay FMG's debt is unenforceable.

For the reasons stated above, Spice is not entitled to summary judgment on this claim.

SanDisk's motion for summary judgment on Count IV is granted.

## C.  Promissory Estoppel (Count VII)

Spice asserts that it reasonably relied upon SanDisk's promise that Spice would get paid,

and thus Spice's promissory estoppel claim should survive summary judgment.[7]  "Promissory

estoppel is an equitable doctrine that 'impl[ies] a contract in law where none exists in fact.'"

*Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000) (quoting *Grouse v.*

*Grp. Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981)).  "It requires proof that 1) a clear

and definite promise was made, 2) the promisor intended to induce reliance and the promisee in

fact relied to his or her detriment, and 3) the promise must be enforced to prevent injustice." *Id.*

---

[7]     Spice seemingly does not assert a promissory estoppel claim with respect to SanDisk's
alleged promise of future accounts.  If there ever was such a claim, the Court considers it waived
since it has not been addressed in any of Spice's submissions.

"[T]he promisor should reasonably expect to induce action or forbearance on the part of the promisee." *Id.*

As noted above, SanDisk's alleged promise to pay the debts owed by FMG is within the statute of frauds.

> In *Del Hayes & Sons, Inc. v. Mitchell*, 230 N.W.2d 588, 594-94 (Minn. 1975), the Minnesota Supreme Court identified three approaches courts have taken concerning the applicability of the statute of frauds defense to promissory estoppel claims. Under the first (or "Restatement") approach, "promissory estoppel will defeat the statute of frauds only when the promise relied upon is a promise to reduce the contract to writing." The second approach . . . rejects "the view that promissory estoppel can remove an oral contract from the statute of frauds." . . . The third and least restrictive approach described by the court states that an oral promise can satisfy the statute of frauds only "where the detrimental reliance is of such a character and magnitude that refusal to enforce the contract would permit one party to perpetrate a fraud." The court went on to note that "[a] mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct, however, is not such a fraud as will justify disregarding the statute."

*Casazza v. Kiser*, 313 F.3d 414, 421-22 (8th Cir. 2002) (citations omitted). While the *Del Hayes & Sons* Court did not endorse any particular view, here, Spice fails to satisfy any of the approaches. SanDisk's alleged promise was not a promise to reduce the contract to writing. Thus, in order for promissory estoppel to remove the alleged oral agreement from the statute of frauds, SanDisk must have engaged in "unconscionable conduct." Spice urges the Court to find that SanDisk's termination of the SanDisk-FMG Contract and entry into the SanDisk-FMP Contract constitutes unconscionable or fraudulent conduct. However, under the SanDisk-FMG Contract, SanDisk was allowed to terminate its relationship with FMG, and it was allowed to enter into representation agreements with other entities. Nor does SanDisk's continued payment of commissions to FMP under the SanDisk-FMP Contract represent unconscionable conduct. SanDisk was obligated to pay FMP under its agreement—to do otherwise would be a material

breach of the SanDisk-FMP Contract.  There is no evidence that SanDisk "perpetrate[d] a fraud."

Thus, this promissory estoppel claim cannot survive.

Even if the statute of frauds defense did not apply to the promissory estoppel claim,

Spice's claim still fails.  First, Spice has failed to show a "clear and definite promise."  As

previously discussed, there was no discussion of the exact amount SanDisk purportedly promised

to pay Spice, for which commissions SanDisk would pay, or when or how the amount would be

paid.  A claim for promissory estoppel may be dismissed on summary judgment when the

alleged promises are "too general to support a promissory estoppel claim."  *Minn. Deli*

*Provisions Inc. v. Boar's Head Provisions Co.*, 606 F.3d 544, 551 (8th Cir. 2010) (quoting

*Elvgren Paint Supply Co. v. Benjamin Moore & Co.*, 948 F.2d 1082, 1084 (8th Cir. 1991)).

SanDisk's promise that Spice "will be paid" is not a clear and definite promise to support a

promissory estoppel claim.

Further, Spice must show that it reasonably relied on SanDisk's promise to Spice's

detriment.  Without addressing the reasonableness of Spice's reliance, the record does not

support any finding that there was detriment.  Spice "must demonstrate some detriment—

damage—caused by [its] reliance."  *See Gauff v. Wimbley*, 2011 WL 1363981 (D. Minn. Apr. 11,

2011).  To prove detrimental reliance, Spice must show "an actual change in . . . position."

*Krutchen v. Zayo Bandwidth Northeast, LLC*, 591 F. Supp. 2d 1002, 1017 (D. Minn. 2008).

"Mere speculation is insufficient to show reliance."  *Id.*  In actions based on promissory estoppel,

"[r]elief may be limited to damages measured by the promisee's reliance."  *Dallum v. Farmers*

*Union Cent. Exchange, Inc.*, 462 N.W.2d 608, 613 (Minn. Ct. App. 1990) (quoting *Grouse*, 306

N.W.2d at 116).  "In other words, relief may be limited to the party's out-of-pocket expenses

made in reliance on the promise."  *Id.*  Spice claims that the "loss [it] suffered was the time and

money spent on maintaining relationships and sales contacts with SanDisk clients."  Pl.'s Mem.

Response to SanDisk's Motion for Summ. J. 29.  Lenaghan testified that Spice personnel

continued to call on accounts they had been soliciting, but there is no evidence of Spice's out-of-

pocket expenses made in reliance on SanDisk's promise to pay FMG's debt.  The record does

not show how much time was lost, nor the cost of that time to Spice.  Further, the two individuals

who incurred these lost expenses and time were Jeff Peterson and Steve Peterson—two

independent contractors who Spice admittedly did not compensate for their time or expenses.[8]

Jeff Peterson and Steve Peterson are not parties to this lawsuit.  Spice has put forth no evidence

of expenses *Spice* has incurred, or time *Spice* has spent in reliance on SanDisk's promise.  Thus,

there is no evidence from which a fact-finder could conclude that Spice detrimentally changed its

position in reliance on SanDisk's promise to pay.

A promissory estoppel claim has to involve a promise that must be enforced to prevent

injustice.  "[T]he test is not whether the promise should be enforced to do justice, but whether

enforcement is required to prevent an injustice."  *Cohen v. Cowles Media Co.*, 479 N.W.2d 387,

391 (Minn. 1992).  Given the applicability of the statute of frauds, the lack of a clear and definite

promise, and Spice's failure to show any change in position or detriment, the Court concludes

that enforcement of SanDisk's alleged promise to pay FMG's debt is not required to prevent

injustice.

## D.  Tortious Interference with Business Expectancy (Count IX) and Tortious Interference

##     with Contract (Count X)

To prevail on a claim of tortious interference with contractual relations, Spice "must

prove that: (1) a contract existed; (2) the alleged wrongdoer . . . had knowledge of the contract;

---

[8]     Spice's independent sales agents were compensated in the form of a portion of the sales
commissions, but were never paid for their time or expenses.

(3) the alleged wrongdoer intentionally interfered with the contract; (4) the alleged wrongdoer's actions were not justified; and (5) damages were sustained as a result." *Minn. Deli Provisions Inc. v. Boar's Head Provisions Co.*, 606 F.3d 544, 549 (8th Cir. 2010) (quoting *Guinness Import Co. v. Mark VII Distrib., Inc.*, 153 F.3d 607, 613 (8th Cir. 1998)). "Further, '[t]o prevail on a claim of interference with prospective economic relations, [Spice] must prove [SanDisk] intentionally committed a wrongful act that improperly interfered with [Spice's] prospective business.'" *Id.*

Spice alleges that SanDisk interfered with the Spice-FMG Contract when SanDisk terminated the SanDisk-FMG Contract and entered into the SanDisk-FMP Contract, knowing that doing so would affect Spice's contract with FMG. However, SanDisk's mere knowledge of the Spice-FMG Contract is not alone sufficient. Spice must prove that SanDisk was wrongful or not justified in its actions. Spice cannot do so.

First, it is undisputed that it was FMG who asked SanDisk to terminate the SanDisk-FMG Contract. There is no evidence that SanDisk had any role in the creation of FMP. Nor is there evidence that SanDisk encouraged Forsythe to create a new company in order to terminate his relationship with or avoid his obligations to Spice. The fact that FMP was created on June 19, 2006, the same day as the SanDisk-FMG Contract was terminated, is not evidence of *SanDisk's* supposed nefarious intent. In fact, the evidence consistently demonstrates that SanDisk repeatedly urged FMG to perform under FMG's contract with Spice.[9]

---

[9]    Spice notes in its brief that SanDisk continued to make payments to FMP until November 2008, even after Spice initiated this lawsuit. Spice appears to believe that this undercuts SanDisk's argument that SanDisk was trying to help Spice get paid by FMG. However, Spice ignores the fact that SanDisk had a contract with FMP that obligated SanDisk to pay commissions to FMP. Had SanDisk not done so, it would have been in breach of the SanDisk-FMP Contract. SanDisk's continued payments to FMP are not evidence that SanDisk was somehow complicit in FMG's nonpayment to Spice.

Under the terms of the SanDisk-FMG Contract, FMG was prohibited from binding SanDisk in any way. Additionally, SanDisk was permitted to terminate its relationship with FMG and "appoint other agents or representatives to the assigned territory and/or accounts." Ex. 40. SanDisk was free to enter into a contract with FMP, or any other entity. "Generally, a defendant's actions are justified if it pursues its legal rights via legal means." *Noble Sys. Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008) (citing *Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 32-33 (Minn. 1982)). "The general rule with which we are concerned is that one has the right to be secure in his contracts and to pursue his business . . . free from the interference of others *except where such others act in pursuance of a superior or equal right*." *Id.* (quoting *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 897 (Minn. 1965)) (emphasis added). "Liability for wrongful interference may be avoided by showing that the defendant was justified by a lawful object which he had a right to assert." *Bennett*, 134 N.W.2d at 897. There is no evidence that the Spice-FMG Contract superseded the SanDisk-FMG Contract. SanDisk was entitled to assert its rights under its contract with FMG.

Even though a defendant's justification is ordinarily a question of fact to be proven by the defendant, *see Bennett*, 134 N.W.2d at 900-01, here SanDisk has met its burden. Every business decision is likely to have downstream consequences. SanDisk chose to terminate its contract with FMG and enter into a new contract with FMP. SanDisk had the right to make such a decision. Mere knowledge that a decision might affect other parties' contracts is not the same as intentional, unjustified interference. Spice provides no evidence to show that SanDisk was not justified in terminating its contract with FMG or that SanDisk somehow acted in bad faith. There is no evidence that SanDisk benefitted from interfering with Spice's contract. SanDisk was not a party to the Spice-FMG Contract and was not bound by that contract. Viewing the

facts in the light most favorable to Spice, there is no evidence that SanDisk's actions were unjustified, as necessary for a claim of tortious interference with contractual relations.  Likewise, SanDisk's actions did not constitute a wrongful act, as is necessary for a claim of tortious interference with prospective relations.

### E.  Unjust Enrichment (Count XI)

Spice asserts that "[i]t would be inequitable and morally wrong for SanDisk to retain the benefits conferred to them through the hard work and expertise of Spice, and not have to pay the commissions they are owed."  Pl.'s Mem. Response to SanDisk's Motion for Summ. J. 30.  "To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay."  *City of Maple Grove v. Marketline Constr. Capital, LLC*, 802 N.W.2d 809, 817 (Minn. Ct. App. 2011) (quoting *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.,* 544 N.W.2d 302, 306 (Minn.1996)).  "Unjust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."  *Id.* at 817-18.  Spice argues that the benefit conferred was Spice's services in maintaining business relationships with SanDisk clients and continuing to process SanDisk sales through those clients.  However, the benefit Spice seeks to recover is the commissions from these sales.  It is undisputed that SanDisk did not retain the commissions—it paid the commissions to FMG, and then later to FMP.  Thus, there is no evidence that SanDisk unjustly retained any benefit, and so Spice's unjust enrichment claim must fail.

### III.   CONCLUSION

It seems clear that Spice did valuable work and did not receive the payment for which it had contracted—with FMG.  Under the contract, FMG, as found by the arbitrator, owed Spice hundreds of thousands of dollars.  Rather than pay Spice, Forsythe moved out of state and became (apparently) judgment-proof.  Nothing in the written or allegedly implied contracts creates an obligation on the part of SanDisk to indemnify Spice against Forsythe's failures.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. SanDisk's Motion for Summary Judgment [Docket No. 118] is GRANTED.

2. Summary judgment is GRANTED in favor of SanDisk as to Counts I, III, IV, V, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV of the Complaint.

3. Spice's Motion for Partial Summary Judgment [Docket No. 123] is DENIED.

Dated:  December 22, 2011

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

32